NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-429

ADOPTION OF QMANI.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Juvenile Court judge, upon petition of the Department of Children and Families (department), terminated the parental rights of the father pursuant to G. L. c. 210, § 3.  On appeal, the father contends that the department failed to demonstrate by clear and convincing evidence that he endangered the child or exhibited grievous parental shortcomings that justified terminating his parental rights.  We affirm.

Background.  The father was sixteen years old in 2017, and he did not know that he had a child who was born in August of that year.  The child's birth certificate did not identify a father, and the mother subsequently named a different person as the child's father.  After numerous reports under G. L. c. 51A, the department placed the child in the custody of foster parents

_____

[1] A pseudonym.

in October 2018, and a year later a judge of the Juvenile Court terminated the mother's parental rights.

In the meantime, the father, living with his mother, initially believed that his friend was the child's father.  In July of 2019, the father had a physical altercation with a girlfriend.  A criminal complaint (later dismissed) charged him with assault and battery on a family or household member and strangulation or suffocation.  After these events, he learned that his friend was not the father of the child.  On September 30, 2019, the father came forward and reported to the department that he might be the father of the child.  A paternity test later confirmed that he was the biological father.

Over the next two years, the department developed a series of family action plans and monitored the father's progress in meeting goals related to his capacity to parent the child.  By February 21, 2020, the department was focused on having the father build a relationship with the child "through supervised visits and building his parenting knowledge through local classes," and noted concerns about the father's potential gang involvement and substance use.  On August 24, 2020, the department continued to note concerns about substance use and the father "not knowing the responsibilities of being a parent." Goals included coming to child visits sober and participating in

a substance abuse program and a domestic violence and anger management program.

On February 16, 2021, the father, age twenty, became the parent of a second child. That child lived with his mother. The father did not maintain a romantic relationship with the mother but visited with this child.

On March 9, 2021, the department changed the goal from adoption to reunification and continued to monitor the father's progress toward meeting parenting goals. The department remained concerned about the father's knowledge of the responsibilities of being a parent (of not just one but two children); failure to create a concrete future living plan; inconsistent attendance at visits; ability to maintain consistent employment and budget his funds; and ability to generally provide for the child's safety. Goals continued to include participation in supportive services, coming to child visits sober, attending all visits, and attending visits on time.

The father did not successfully complete all of the recommended programs. Although he completed the Nurturing Fathers Program in June 2020, he attended only seven batterer intervention group sessions and missed five before dropping out in April 2021. After being referred again to the program in

3

August 2021, the father attended four out of eight sessions before dropping out a second time.  On October 18, 2021, the police arrested the father, and another criminal complaint issued for assault and battery on a household member, strangulation, assault and battery, and assault with a dangerous weapon.  For over a one year prior to trial, the father did not consistently visit the child, did not contact the foster parents to learn about the child's needs, and failed to engage in many of his action plan tasks.  On February 3, 2022, the department changed the goal to adoption.

Since October, 2018, the child has continuously lived with the foster parents and two of their children and considers them to be his "real family."  All medical care is up to date, and the child attends pre-kindergarten.  The child is no longer in need of an individualized education plan for developmental and behavioral difficulties as he had needed in preschool.

After the conclusion of the trial, the judge terminated the father's parental rights, finding that "[the father] lacks the ability, capacity, fitness and readiness to assume parental responsibility for said child, and is currently unfit, and that the best interests of said child, as defined in G. L. c. 210, § 3 (c), will be served by a decree terminating the rights of [the father]."

4

Discussion.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents.'"  Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting G. L. c. 210, § 3 (c).  "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. 53, 59 (2011).

Here, we discern no error in the judge's ultimate conclusions based upon the evidence presented.  That evidence showed that the father "blacked out" in 2019 during an altercation with his girlfriend and was charged with assault and battery on a family or household member and strangulation or suffocation, failed to comply with the department's family

5

action plans, lacked any concrete future living plans and failed to complete budgeting and financial instruction, missed multiple child visits, dropped out of two batterer intervention programs, failed to obtain individual mental health therapy, failed to undergo a substance abuse evaluation, failed to maintain contact with the foster parents, failed to complete family therapy with the child, incurred another strangulation charge involving an incident with a girlfriend at her residence in 2021, and threatened department workers by warning them that "it is not hard to find people's addresses."

The father contends that the judge's finding pertaining to individual therapy is erroneous because such therapy was not mandated by any of the family action plans. We agree that the family action plans do not mandate individual therapy and that the department did not set up individual therapy; however, the father admitted at trial, "They asked me to do individual therapy." He acknowledged that the department informed him individual therapy was necessary to address abuse in the relationship with his girlfriend and further acknowledged that he allegedly "blacked out" during the altercation. His testimony is consistent with testimony of one of the social workers who recalled that the department had referred him for individual therapy. Therefore, even if the judge was mistaken

about the source of the recommended individual therapy, the record indicates, and the father agreed in his testimony, that individual therapy was indeed recommended, but he did not take part in it.  See Care & Protection of Zeb, 489 Mass. 783, 788 (2022) ("Even assuming that some of the judge's subsidiary factual findings are not entirely accurate, there was overwhelming evidentiary support for the [broader] finding" [footnote omitted]); Adoption of Helen, 429 Mass. 856, 860 (1999) ("[A]lthough the judge's findings on these points may have been erroneous, the judge's over-all conclusion of parental unfitness is fully supported by the record").

As an additional contention, the father argues that the failure to engage in a substance abuse evaluation is not indicative of father's unfitness.  We disagree.  There was ample evidence in the record that the department had concerns about substance abuse.  One of the family action plans required the father to "[p]articipate in a substance abuse evaluation."  His facebook profile detailed marijuana use.  At trial, the father acknowledged that the department confronted him about showing up at a child visit while smelling of marijuana.  He claimed that the odor came from his friends smoking marijuana.  The father admitted that he never obtained a substance abuse evaluation after the department requested one.  Given the evidence that the

father potentially struggled with substance abuse and the recommendations communicated by the department to the father, we perceive no error in the judge considering the father's failure to obtain an evaluation. Contrast Adoption of Oren, 96 Mass. App. Ct. 842, 845 n.4 (2020) (failure to obtain substance abuse treatment has no bearing on fitness where judge concluded alcohol and drug addiction were not factors and family action plan did not mandate such treatment).

We also note that the judge expressly rejected any suggestion that she based her decision on any single factor: "In reaching this conclusion, the Court has considered the evidence in the aggregate, and has not given conclusive weight to any single component standing alone." See Petitions of Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 290 (1987) ("Generally, no one factor is determinative and the judge should weigh all the evidence" [footnote omitted]).

Finally, the father broadly contends that imperfection as a person does not equate to unfitness as a father and further maintains that his past mistakes are neither probative of his ability to parent the child in the future nor so grievous as to necessitate terminating his parental rights. The trial judge considered the factors set forth in G. L. c. 119, § 26, and G. L. c. 210, § 3 (c), including the best interests of the

child, in making her decision.  "Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment." Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975).  The father's "dissatisfaction with the judge's weighing of the evidence" is not a sufficient basis to warrant relief on appeal. Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).

While we appreciate that the father did make some efforts after the paternity test and showed, at times, genuine concern and affection for the child, we conclude that the judge did not abuse her discretion or commit a clear error of law.  Adoption of Jacques, 82 Mass. App. Ct. at 609.

Decree affirmed.

By the Court (Henry,
  D'Angelo & Hodgens, JJ.[2]),

Assistant Clerk

Entered: May 17, 2024.

---

[2] The panelists are listed in order of seniority.